1                                                              "O"

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       SOUTHERN DIVISION

11  JEFFREY K. MARHEINE,          )    SA CV 06-966 AHS (RNBx)
                                  )
12               Plaintiff,       )
                                  )
13        v.                      )    ORDER DENYING DEFENDANT'S
                                  )    MOTION FOR SUMMARY JUDGMENT;
14  JOHNSON & JOHNSON SERVICES,   )    ORDER SETTING FINAL PRETRIAL
    INC.,                         )    CONFERENCE ON APRIL 13, 2009,
15                                )    AT 2:00 P.M. AND JURY TRIAL
                                  )    ON MAY 19, 2009, AT 9:00 A.M.
16               Defendant.       )
                                  )
17  _____)

18                              **I.**

19         **PROCEDURAL BACKGROUND OF PENDING MOTION**

20         On April 21, 2008, defendant Johnson & Johnson Services,

21  Inc. filed a motion for summary judgment ("the Motion" or "MSJ").

22  On May 12, 2008, plaintiff Jeffrey K. Marheine filed opposition to

23  the Motion and objections to defendant's declarations ("plaintiff's

24  objections").  On June 2, 2008, defendant filed a reply, a response

25  to plaintiff's objections, and objections to plaintiff's

26  declarations ("defendant's objections").  On June 5, 2008,

27  plaintiff filed objections to evidence submitted in conjunction

28  with defendant's reply ("plaintiff's supplemental objections").  On

1  June 9, 2008, the Court heard the Motion, ordered the parties to

2  lodge proposed orders for the purpose of ruling on their

3  evidentiary objections, and took the matter under submission.  By

4  this order, the Court denies defendant's motion.[1]

5                              **II.**

6            **SUMMARY OF THE THIRD AMENDED COMPLAINT**[2]

7            Johnson & Johnson Sales Recruiting ("JJSR") is a division

8  of named defendant JJS.  JJS is, in turn, a wholly owned subsidary

9  of J&J.  JJSR provides recruiting services to various subsidiary

10  companies of J&J.

11           Plaintiff began working for JJSR in 1990 and, in 1999,

12  became a recruiter.  TAC, ¶ 7.  As a recruiter, plaintiff worked

13  with managers at various J&J subsidiaries to assist them in finding

14

15      [1]  The Court requested the parties lodge the depositions
16  referred to in the motions pursuant to Local Rule 5-1.  The Court
    combed the record to find the exhibits referred to in the
17  parties' papers.  In the deposition of Jeffery Marheine, the
    Court found that the parties stipulated to a set of exhibits to
18  which all deponents could refer.  The Court concludes that
    defendant has possession of the relevant set of exhibits since it
19  was defendant's counsel who proposed the "single set" suggestion
    in the foregoing deposition.  Accordingly, because no set of
20  exhibits was submitted to the Court in response to the request
    for depositions, the Court elects to infer that the exhibits
21  contain the material quoted by plaintiff in his opposition to the
    motion for summary judgment.
22

23      [2]  Plaintiff filed the Complaint in this wrongful
    termination action, naming Johnson & Johnson, Inc. as the
24  defendant on October 11, 2006.  On November 14, 2006, plaintiff
    filed a First Amended Complaint, substituting Johnson & Johnson
25  Services, Inc. ("JJS") as Defendant.  On May 3, 2007, plaintiff
    filed a Second Amended Complaint ("SAC") pursuant to stipulation
26  and order of Court.  On October 1, 2007, with leave of Court,
    plaintiff filed a Third Amended Complaint ("TAC") adding Johnson
27  & Johnson ("J&J") as an additional defendant (dismissed by
    stipulation on February 11, 2008).  On May 15, 2008, the parties
28  stipulated to dismissal of claims three through seven of the TAC.

1  candidates to fill job openings in Southern California.  TAC, ¶ 8.

2          Plaintiff sent a Hispanic candidate to interview with a

3  hiring manager at Ethicon, Inc., a J&J subsidary, and during the

4  interview, the hiring manager, Lloyd Lowry ("Lowry") made

5  inappropriate comments about the candidate's Hispanic heritage.

6  TAC, ¶ 9.  After hearing about the incident from the job candidate,

7  plaintiff reported Lowry's behavior to plaintiff's manager and

8  subsequently to Human Resources.  TAC, ¶ 10.  After plaintiff

9  reported the incident, Lowry appeared to develop a dislike for

10  plaintiff.  Id.

11          During plaintiff's years as a recruiting manager, he

12  consistently received positive reviews for his work.  TAC, ¶ 11.

13  In 2006, plaintiff sent an African-American woman to interview for

14  an open position at PriCara, another J&J subsidiary. TAC, ¶ 12.

15  PriCara's Regional Business Director/Hiring Manager, Russ Stough

16  ("Stough"), stated that he did not want to hire her because she was

17  a single mother who would be required to move to Las Vegas for the

18  job.  Id.  Another PriCara Hiring Manager, Karen Martin ("Martin"),

19  stated her strong dislike for hiring women with children and a

20  reluctance to hire Asians.  TAC, ¶ 13.

21          On or about March 23, 2006, plaintiff informed the

22  Director of Sales Recruiting, Cindy Burkhardt ("Burkhardt") about

23  the illegal hiring practices he had observed at PriCara.  TAC, ¶

24  14.  Within days of reporting these illegal practices, plaintiff

25  began to receive critical feedback from Burkhardt.  TAC, ¶ 15.  On

26  April 6, 2006, through an e-mail, plaintiff confronted Burkhardt

27  about the questionable timing of her criticism.  TAC, ¶ 16.

28  Approximately four months after plaintiff criticized certain

illegal hiring practices; plaintiff was criticized, written up, placed on probation, and terminated.  TAC, ¶ 17.

Plaintiff's remaining claims assert retaliation in violation of the California Fair Employment and Housing Act (TAC, ¶¶ 23-28), wrongful termination in violation of public policy (TAC, ¶¶ 29-32), and retaliation in violation of Title VII of the Civil Rights Act of 1964 (TAC, ¶¶ 64-69).  Plaintiff seeks compensatory and general damages, punitive damages, statutory penalties, attorney's fees, costs of suit, and prejudgment interest.

**III.**

**<u>SUMMARY OF PARTIES' CONTENTIONS</u>**

**A.      Defendants' Motion for Summary Judgment**

        **1.    Time Line of Incidents and Background**

In November 2005, JJSR modified its recruiting model to require hiring managers at J&J operating companies to use JJSR as their primary and first provider of recruiting services.  Before this time, hiring managers at J&J operating companies had the option of using outside recruiters.

In January 2006, plaintiff's direct supervisor, Lori Skjong-Nilsen ("Skjong-Nilsen"), based in Texas, directed plaintiff to present JJSR's change in policy to Southern California hiring managers for PriCara, a J&J operating company.  Skjong-Nilsen Decl. ¶ 38, MSJ Ex. 105.  Plaintiff did not make the presentation.  As a result, PriCara attempted to process a candidate through JJSR, but the attempt was rejected because the candidate was procured through an independent recruiter, not through JJSR.  In response, PriCara hiring manager Stough complained to Burkhardt, JJSR's Director of Sales Recruiting.  Stough's e-mails to Burkhardt indicate

dissatisfaction with communication between Burkhardt's team and PriCara regarding JJSR's new recruiting policy.   MSJ Ex. 109.

On March 27, 2006, in response to plaintiff's failure to timely advise PriCara of JJSR's change in recruiting policy, Burkhardt directed Skjong-Nilsen, plaintiff's direct supervisor, to issue a formal memorandum of discipline to plaintiff.   Shortly thereafter, Burkhardt e-mailed Skjong-Nilsen and plaintiff to schedule a conference call regarding plaintiff's performance.   On March 28, 2006, plaintiff wrote back, indicating he believed it would not be "in my best interest to speak live about the issues involving Russell Stough."   MSJ Ex. 111.

On March 29, 2006, Burkhardt sent plaintiff an e-mail outlining her concerns and noting they were not just about the PriCara presentation but "the greater problem which is your overall performance to include complaints from multiple organizations, customers requesting not to work with you, communication issues, customer management issues and conflict management."   MSJ Ex. 113.

On April 6, 2006, while on medical leave, plaintiff sent an e-mail to Burkhardt in which he suggested he was being retaliated against for complaining of Stough, Martin, and Lowry's illegal hiring practices.   MSJ Ex. 114.

Over the course of the next few months, JJSR assured plaintiff they were concerned with his claims of illegal hiring practices.   MSJ Ex. 117.   However, as employees of independent companies with their own supervisors and line of authority, JJSR had no authority to admonish these individuals.

After returning from medical leave in late April, plaintiff's performance continued to decline.   On July 21, 2006,

Skjong-Nilsen received a notice from Mark Berghoefer, a business director at Ortho-McNeil, that a week had elapsed during which plaintiff failed to advise a candidate that she had not been chosen for a position.  MSJ Ex. 120; Skjong-Nilsen Dec. ¶ 66.

On July 11, 2006, plaintiff was given a formal termination warning.  MSJ Ex. 124; Skjong-Nilsen Decl. ¶ 71.

### 2.   Summer Hours Program

JJSR implemented a "Summer Hours Program" allowing employees to work additional hours on certain days to cover the required hours during the week prior to taking a Friday off.  MSJ Ex. 125.  Employees were allowed to take every other Friday off if they worked nine straight days of additional hours.  Plaintiff elected to participate in the program.  Skjong-Nilsen Decl. ¶ 73.

In August, Skjong-Nilsen conducted a survey of records regarding plaintiff's access card use and computer log-on, log-off records.  Skjong-Nilsen Decl.¶ 77.  As part of his job duties, plaintiff was required to keep regular access to e-mail and continually enter data, based on conversations with candidates and customers, on the JJSR form.  This required him to be logged on to the JJSR computer network during working hours.  Id.  These computer records showed that plaintiff was regularly taking days off and working less than a full 40-hour week.  MSJ Ex. 126.  The parking garage records also showed that plaintiff was at the office less than 7.5 hours a day during the summer months.  MSJ Ex. 127.

These records proved to Skjong-Nilsen the accuracy of complaints made about plaintiff.  Accordingly, she made the decision to terminate him.  Following a review of Skjong-Nilsen's recommendation, plaintiff was terminated on August 14, 2006.

> **3.    Plaintiff Does Not Establish a Prima Facie Case for Retaliation**

Plaintiff fails to establish a causal link between the protected activity and his firing.  First, plaintiff claims Burkhardt retaliated against him, but the undisputed evidence is that Skjong-Nilsen made the firing decision.  MSJ Ex. 124; Skjong-Nilsen Decl. ¶ 82.  Second, the initial decision to discipline plaintiff was in response to his failure to conduct the PriCara presentation.  Third, Stough, Martin, and Lowry, the individuals plaintiff accused of making improper statements, were not employees of defendant.  As employees of separate operating companies their behavior created no risk for JJSR and therefore no motive to retaliate.  Finally, four months, the time between plaintiff's reporting and termination, is too long to find the existence of a causal link.

> **4.    Reasons for Termination were Legitimate and Non-Retaliatory**

Plaintiff had a history of poor performance dating back to 2003.  MSJ Ex. 104.  In July 2006, plaintiff was also the subject of a complaint for lack of responsiveness.  Skjong-Nilsen Decl. ¶ 66.  The most significant shortcoming was plaintiff's failure to present the new recruiting model to PriCara in a timely manner.

In addition, plaintiff's metric scores show that he was in the bottom of the department in terms of performance after 2 quarters in 2006.  MSJ Ex. 124.  He failed to work the hours required to do his job effectively.

//

### 5.   There is no Evidence of Pretext

Defendant acted consistently in its treatment of plaintiff and other recruiters.  Only one other individual had a lower metric score than plaintiff and was also fired.  Skjong-Nilsen Decl. ¶ 90.  Defendant's reasons for termination were also consistent with the warnings previously given to plaintiff dating back to 2004.  The decision was in good faith as it was based on plaintiff's minimal work effort and substandard performance.

### 6.   Plaintiff had no Reasonably-Based Suspicion of Unlawful Activity

Plaintiff's April 6, 2006 communication accuses Burkhardt of retaliation but he did not report the alleged wrongful conduct to Burkhardt prior to his April e-mail.  Burkhardt Decl. ¶ 40.  Where there is no evidence the employer knew of an employee's opposition, there can be no basis for a retaliation claim.

### 7.   Plaintiff Failed to Mitigate Damages

Plaintiff voluntarily elected not to work for more than a year, thereby willfully failing to mitigate any purported damages.  Neubauer Decl. ¶ 24.

### B.   Plaintiff's Opposition

#### 1.   Time Line of Incidents and Background

Plaintiff began his career at J&J in 1990.  In 1998, he transferred to JJSR, a J&J subsidiary to work as a recruiter in the Southern California region.  His primary job was to locate, interview, and screen applicants for the position of pharmaceutical representative for J&J subsidiaries operating in the region.  Marheine Decl. ¶ 3.

Plaintiff works from home an average of 60-90 minutes a

day, and it is undisputed that he was never told he was expected to spend eight hours a day in the Irvine office.  Nearly all recruiters, including Marheine, worked at least a portion of their workweek from their homes.  Marheine Decl. ¶ 3; Skjong-Nilsen Depo., 33:1-33.

As a federal contractor, JJSR's compliance with federal anti-discrimination guidelines was a primary goal of the new hiring process JJSR instituted in 2005, wherein all recruitment of J&J subsidiary offices would go through JJSR.  Burkhardt Depo., 25:1-26:23.

In early 2006, plaintiff participated in several uncomfortable conversations with hiring managers of J&J subsidiaries wherein it became clear to plaintiff that these hiring managers were engaging in discriminatory hiring practices.  On two different occasions he reported allegedly discriminatory hiring practices engaged in by district managers at J&J subsidiary companies for whom JJSR conducted recruiting.  First, in 1999, an applicant accused district manager Lowry of Ethicon of discrimination based on nationality.  Plaintiff conveyed this charge to J&J Human Resources.  Marheine Decl. ¶ 7.  Then, in "early 2006," plaintiff had "several uncomfortable conversations" with district managers for whom JJSR recruited suggesting the managers were engaged in illegal hiring practices.  Marheine Decl. at ¶ 10.)  Plaintiff alleges Karen Martin ("Martin"), a district manager for PriCara, informed plaintiff that she did not want to hire a candidate because "she did not want any more 'quiet Asians' on her team."  Id.  This conversation with Martin led him to believe she no longer wanted him to send her any Asian job

applicants.  Plaintiff further alleges that "around that time"
Martin refused to hire a woman because she had taken time off to
have children and that Martin said she could not "possibly ever
promote a woman who took time off to have children."  Id. ¶ 10.

Jenn Hall, a fellow recruiting manager, conveyed to
plaintiff that Russ Stough ("Stough"), a regional business director
for PriCara, refused a job offer to a single mother because he felt
"she could not handle the job."  Marheine Decl. ¶ 11.  This gave
plaintiff the impression that Stough did not want to hire single
mothers.  Id.

On March 23, 2006, plaintiff reported Stough and Martin's
alleged discriminatory hiring practices during a conference call
with Burkhardt.  On March 27, 2006, plaintiff received written
discipline from Skjong-Nilsen.  The discipline was retaliation for
plaintiff's March 23, 2006 complaint.  Skjong-Nilsen told
plaintiff the discipline was ordered by Burkhardt in response to an
incident that occurred in January when plaintiff delayed a meeting
with Robert Gibney ("Gibney"), PriCara's regional business
director, during which he was to present JJSR's new recruiting
model to Gibney.  The Stough e-mail regarding lack of communication
with PriCara is a criticism of Burkhardt, not of plaintiff.  MSJ
Ex. 109.

On March 29, 2006, Burkhardt alleged additional
performance issues.  MSJ Ex. 113.  These issues were never raised
prior to the March 23, 2006 complaint.  Shortly after receiving the
March 29, 2006 e-mail, plaintiff took a leave of absence for a
month.

On April 6, 2006, plaintiff complained to Burkhardt that

1  she was retaliating against him for complaints brought against

2  Stough, Martin, and Lowry.  MSJ Ex. 114.  Burkhardt continued her

3  effort to retaliate against plaintiff and made clear that she was

4  angry about his April 6, 2006 e-mail.

5          After plaintiff lodged his complaint, volumes of

6  statistics were generated regarding Voice of Customer ("VOC")

7  satisfaction ratings.  VOCs were computer-generated surveys sent to

8  plaintiff's customers when they completed the process of filling a

9  position.  On July 11, 2006, plaintiff was told he needed to get

10  his VOC rating up to 4 and had until September 4, 2006, to improve

11  his performance.  MSJ Ex. 124.  However, plaintiff began receiving

12  high marks on his VOCs.  His direct supervisor, Skjong-Nilsen,

13  reported to Burkhardt that plaintiff was showing improvement and

14  that she had received positive feedback regarding his work.  Opp.

15  Ex. 67.

16          Burkhardt made modifications to the statistics generated

17  after July 1, 2006, to falsely portray plaintiff as failing in his

18  job.  First, she removed VOC numbers from all surveys relating to

19  work performed by plaintiff's assistant.  Burkhardt Depo, 167:8-

20  168:5, Opp. Ex. 95.  Plaintiff believes he showed significant

21  improvement during the relevant period but his numbers averaged out

22  to a 2.4, the lowest score in the country.  Opp. Ex. 95.  Plaintiff

23  protests that the hard data supporting these findings has not been

24  provided.  Opp. Ex. 152.  In fact, as of August 8, 2006, plaintiff

25  was number one in the country in his VOC response rate, his time to

26  fill positions was four weeks, while the nationwide average was

27  seven weeks, and he was averaging a 4.0 on the remainder of his

28  metrics.  Opp. Exs. 74, 137, 152.  Despite showing improvement,

preparation for plaintiff's termination began in early August. Opp. Ex. 74.

### 2. Summer Friday Program

Plaintiff was given permission to take advantage of the Summer Friday Program and take time off during the summer.  He confirmed time off with Skjong-Nilsen over the course of the summer.  Opp. Exs. 135 and 136.  Skjong-Nilsen was made aware of every Friday plaintiff took off.  Skjong-Nilsen Depo. 192:1-18. While defendant claims plaintiff was improperly not in the office eight hours a day, it is undisputed that there is no policy to that effect.  Burkhardt Depo. 70:23-71:19.

Skjong-Nilsen began a statistical inquiry into plaintiff's working hours, purportedly in response to "an increased trend in unsolicited" negative feedback.  However, Burkhardt and Skjong-Nilsen both testified that they had no recollection of negative feedback during that time.

Plaintiff worked from home 60 to 90 minutes per day. Thus, reports that his car was in the garage for less than eight hours a day are irrelevant.  Also, reports of plaintiff's car's location are misleading because they do not reflect times when plaintiff was at job fairs and meetings out of the region or his car was not parked at work.

### 3. Direct Evidence of Retaliation

There is direct evidence that Burkhardt bore retaliatory animus against plaintiff.  This evidence is in the form of e-mails and statements in which Burkhardt indicates her anger with plaintiff and personal offense taken at his April 6, 2006 e-mail.

Burkhardt was a decision-maker and was closely involved

in plaintiff's discipline and termination.  The decision to discipline plaintiff on March 27, 2006, was at Burkhardt's direction, as was the decision to place him on probation.

### 4.   **McDonnell Douglas** Framework

#### a.   **Prima Facie Claim of Retaliation**

Plaintiff establishes a prima facie claim of retaliation pursuant to McDonnell Douglas.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). He engaged in protected activity through his March 23, 2006 phone report to Burkhardt.  Plaintiff shows that he experienced multiple adverse employment decisions including written discipline on March 27, 2006, and placement on probation on July 11, 2006, before his August firing.

The timing between his March 23, 2006 complaint and the adverse employment actions establish a causal connection between plaintiff's protected activity and the adverse action.  Plaintiff also offers direct evidence of retaliation in the form of remarks made by Burkhardt.

It is pointless to argue that defendant had "no motive" to retaliate against plaintiff's claims.  Burkhardt did so because she took it personally, not because of economic factors within the company.

#### b.   **Pretext**

Besides direct evidence of retaliation, the fact that JJSR failed to investigate plaintiff's complaints is evidence of pretext.  Although plaintiff complained in writing that Burkhardt was retaliating against him, Weintraub, JJSR's human resources representative, never investigated the claim.  Plaintiff also

ranked second to last prior to his termination.  However, the individuals who ranked third and fourth to last with virtually indistinguishable scores from plaintiff, were both promoted within weeks of the rankings being published.  MSJ Ex. 123.

Plaintiff was also a long-term employee whose performance had not changed in any significant way.  However, JJSR applied "heightened scrutiny" to Marheine's performance only after the March 23, 2006 and April 6, 2006 complaints of discriminatory and retaliatory practices.  The March 27, 2006 warning was given within days of the March 23, 2006 complaint, but concerned events having occurred months earlier.  There is no plausible explanation for the delay.

When plaintiff was placed on probation, JJSR identified four metrics on which plaintiff needed to improve.  These metrics were virtually ignored, however, when plaintiff was terminated, and the Summer Hours Program and his lack of sufficient work hours were cited instead.  Plaintiff's supervisor has also offered inconsistent reasons for looking at plaintiff's work hours: telling plaintiff she wanted to help him and telling Weintraub she believed he was not working sufficient hours.

**C.        Defendant's Reply**

A chain of disciplinary events was set in motion prior to the March 27, 2006 disciplinary memo.  The earlier disciplinary events occurred in early February and were in response to plaintiff's failure to make a timely presentation to his customers regarding changes in JJSR hiring practices.  Plaintiff also admits that Burkhardt's attitude toward him changed as early as January 2006.

1     Plaintiff cannot establish a causal link between the
2  alleged protected activity and the purported retaliation because
3  Burkhardt was unaware of the supposed claim upon which the
4  retaliation was based when she first began disciplining plaintiff.

5     Plaintiff does not dispute the accuracy of computer login
6  records as a non-discriminatory basis for adverse action.  Those
7  records demonstrate that, even if he was working at home, he was
8  working abbreviated hours for which he was paid as a full-time
9  employee.

10    Plaintiff does not dispute that he violated the Summer
11 Hours Program requirements.  This violation of company policy is a
12 non-pretextual basis for terminating plaintiff.

13    Plaintiff's statistical metric performance was also a
14 non-pretextual basis for termination.  Plaintiff's improvements
15 were isolated.  While the number of customers responding to the
16 survey request increased, their ratings did not.

17    Plaintiff does not dispute his failure to mitigate
18 damages.  His failure to seek replacement employment in the eight
19 months following his termination precludes him as a matter of law
20 from obtaining damages.

21                              **IV.**

22                         **LEGAL STANDARD**

23    Summary judgment is proper when the "pleadings,
24 depositions, answers to interrogatories, and admissions on file,
25 together with affidavits, if any, show that there is no genuine
26 issue as to any material fact."  Fed. R. Civ. P. 56(c).  An issue
27 is "genuine" only if there is a sufficient evidentiary basis on
28 which a reasonable fact finder could find for the nonmoving party.

See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.  <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996).

Viewing the evidence in the light most favorable to plaintiff, the Court must determine whether any genuine issues of material fact exist and apply the relevant substantive law.  In doing so, "[t]he evidence of the [nonmoving] party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in the light most favorable to the nonmoving party."  <u>Lindahl v. Air France</u>, 930 F.2d 1434, 1437 (9th Cir. 1991).

**V.**

**<u>DISCUSSION</u>**

Having read and considered the arguments and authorities raised in the parties' briefs, and the admissible evidence presented in support thereof, and construing the evidence under the foregoing standard, the Court concludes that defendant's motion for summary judgment should be denied.

Some direct evidence supports plaintiff's claim that the discipline and ultimate termination were in retaliation for his Title VII-protected complaint.  Even without direct evidence of termination based on retaliatory animus, the timing of plaintiff's complaint to his supervisors and his subsequent discipline are enough under the <u>McDonnell Douglas</u> standard to establish a prima facie case that the discipline and termination were pretextual. See <u>McDonnell Douglas</u>, 411 U.S. at 802.

**A.        Alleged Retaliation:  Title VII and State Law Claim**

        The California Fair Employment and Housing Act ("FEHA"),
Cal. Gov. Code §§ 12900-12996, protects an employee from discharge
who "has opposed any practices forbidden under this part or because
the person has filed a complaint, testified, or assisted in any
proceeding under this part."  Cal. Gov't Code § 12940(h).  Title
VII also prohibits an employer from discriminating against an
employee "because he has opposed any practice made an unlawful
employment practice by this subchapter."  42 U.S.C. § 2000e-3; see
Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 59, 126 S.
Ct. 2405, 2410, 165 L. Ed. 2d 345 (2006) ("Title VII's
anti-retaliation provision forbids employer actions that
discriminate against an employee . . . because he has opposed a
practice that Title VII forbids or has made a charge, testified,
assisted, or participated in a Title VII investigation, proceeding,
or hearing."  (citations and quotations omitted)).

        These retaliation provisions provide protection for
employees who speak out against perceived discrimination occurring
in the workplace, regardless of whether they themselves have been
the victims of discrimination based upon possession of certain
characteristics or association with employees who possess certain
characteristics.  See, e.g., Flait v. N. Am. Watch Co., 3 Cal. App.
4th 467, 477-478, 4 Cal. Rptr. 2d 522 (1992) (finding prima facie
retaliation claim stated where plaintiff was male supervisor who
opposed alleged sexual harassment of female employee).  An informal
complaint to a supervisor regarding a Title VII violation is also a
protected activity.  EEOC v. Hacienda Hotel, 881 F.2d 1504, 1514
(9th Cir. 1989) overruled on other grounds by Burlington Indus.,

1  Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633

2  (1998).

3        Under McDonnell Douglas, plaintiff has the initial burden

4  to establish a prima facie case of retaliation.  To make a prima

5  facie showing of retaliation, plaintiff must show that (1) he

6  engaged in a protected activity; (2) defendant took an adverse

7  action against him; and (3) there was a causal link between his

8  involvement in the protected activity and the adverse personnel

9  action undertaken by defendant.  Freitag v. Ayers, 468 F.3d 528,

10 541 (9th Cir. 2006); McGinest v. GTE Serv. Corp., 360 F.3d 1103,

11 1124 (9th Cir. 2004).  "The requisite degree of proof necessary to

12 establish a prima facie case for Title VII on summary judgment is

13 minimal and does not even need to rise to the level of a

14 preponderance of the evidence."  Cordova v. State Farm Ins. Cos.,

15 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted).

16 Alternatively, plaintiff may "proceed by simply producing 'direct

17 or circumstantial evidence demonstrating that a [retaliatory]

18 reason more likely than not motivated the employer.'"  Surrell v.

19 Cal. Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (quoting

20 Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007)).

21 **B.      Genuine Issues of Material Fact Exist Regarding**

22         **Motivation for Plaintiff's Discipline and Termination**

23         **1.   Evidence of Discriminatory Motivation**

24        The Court of Appeals for the Ninth Circuit has ruled that

25 "in light of the reluctance of [the] Circuit to allow summary

26 judgment where there is direct or circumstantial evidence of

27 discriminatory intent," whether defendant "sufficiently insulated

28 the decision-making process from the discriminatory remarks of the

directors," should be determined by a jury.  Schnidrig v. Columbia Mach., 80 F.3d 1406, 1411 (9th Cir. 1996).  Applying this standard, in a retaliation case based on denial of promotion, the Court of Appeals ruled that, "[e]ven if a manager was not the ultimate decisionmaker (in denying the plaintiff a promotion), that manager's motive may be imputed to the company if the manager was involved in the . . . decision."  Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1141 (9th Cir. 2001).  In Bergene, an employee's former supervisor played "an influential role in the selection process" and advised plaintiff's immediate supervisor to make a change in the selection process that disadvantaged plaintiff.  Id.  The Court noted that the former supervisor provided the immediate supervisor "with an assessment of [plaintiff's] abilities."  Id.  Though plaintiff's immediate supervisor was "ultimately responsible" for the hiring decision, the court found the former supervisor's comments were direct evidence of retaliatory animus.

Here, defendant contends the decision to terminate plaintiff was made by Skjong-Nilsen and not by Burkhardt.  Were this the case, direct evidence of Burkhardt's retaliatory motive would be irrelevant.  However, as Skjong-Nilsen's direct supervisor, Burkhardt directed Skjong-Nilsen to send plaintiff the March 27, 2006 disciplinary memorandum and continued to follow up with Skjong-Nilsen regarding plaintiff's performance.  In addition, supporting the suggestion that the final termination decision was not solely made by Skjong-Nilsen, plaintiff was notified of his termination only after Burkhardt's approval was obtained.  Consistent with Bergene, even if the final termination decision was

made by Skjong-Nilsen, evidence of Burkhardt's involvement in
plaintiff's discipline requires the Court to consider evidence of
Burkhardt's arguably retaliatory conduct.  Accordingly, a genuine
issue of material fact exists for the jury to determine whether the
decision to discipline and terminate plaintiff by direct supervisor
Skjong-Nilsen was insulated from superiors engaged in allegedly
discriminatory decision-making.

### 2.   Protected Activity

The FEHA expressly prohibits discrimination on the basis
of certain specified characteristics.  Cal. Gov't Code § 12940(a).
The specified characteristics are identified as race, religious
creed, color, national origin, ancestry, physical disability,
mental disability, medical condition, marital status, sex, age, or
sexual orientation, which are further defined to include "a
perception that the person has any of those characteristics or that
the person is associated with a person who has, or is perceived to
have, any of those characteristics."  Cal. Gov't Code § 12926(m).

The timing of plaintiff's report of Martin's and Stough's
discriminatory statements/practices regarding candidates' race and
sex is in dispute.  While plaintiff alleges reporting the
statements to Burkhart on March 23, 2006, Burkhardt indicates her
first report came through plaintiff's April 6, 2006 e-mail, which
was sent *after* he was initially disciplined.  In addition,
deposition testimony from Nancy Weintraub ("Weintraub"), Human
Relations Business Partner for JJSR, suggests plaintiff's timing is
accurate, while a May 8, 2006 e-mail from Skjong-Nilsen to
plaintiff and cc'd to Burkhardt and Weintraub suggests plaintiff
complained earlier about the practices but does not specify that

1   plaintiff's complaints were made on March 23, 2006.  Weintraub

2   Depo. pp. 55:9-56:3; Deft. MSJ, Ex. 117.

3        The timing of plaintiff's complaint must be viewed in the

4   light most favorable to the non-moving party, leading to the

5   inference that plaintiff did make an earlier report of the Stough

6   and Martin incidents to Burkhardt.  See Stegall v. Citadel Broad.

7   Co., 350 F.3d 1061, 1069 (9th Cir. 2004) (citing Godwin v. Hunt

8   Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998)) (noting

9   "Although Marathon disputes that Stegall actually informed Drake of

10  her complaints, Stegall asserts that she did so, and we must view

11  the evidence in the light most favorable to her").  Plaintiff

12  suggests Burkhardt's statements are direct evidence that his

13  discipline and termination were in response to plaintiff's March

14  23, 2006 complaints.  Given that it is undisputed that plaintiff

15  was disciplined and ultimately terminated, whether plaintiff

16  opposed discrimination on the basis of characteristics protected

17  under the FEHA remains a genuine issue.

18       **3.  Evidence of Discriminatory Motive**

19       "When the plaintiff offers direct evidence of

20  discriminatory motive, a triable issue as to the actual motivation

21  of the employer is created even if the evidence is not

22  substantial."  Godwin, 150 F.3d at 1221.  Where the evidence of

23  intentional discrimination is direct, "plaintiff need produce very

24  little evidence of discriminatory motive to raise a genuine issue

25  of fact."  Lindahl, 930 F.2d at 1438.  "'Direct evidence is

26  evidence which, if believed, proves the fact [of discriminatory

27  animus] without inference or presumption.'"  Godwin, 150 F.3d at

28  1221 (quoting Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085

1   (5th Cir. 1994)).

2           Where direct evidence has been found sufficient to
3   survive summary judgment without resort to McDonnell Douglas, the
4   cases have involved direct evidence of discriminatory animus, not
5   retaliatory animus.  For example, in Godwin, plaintiff offered
6   direct evidence of sexually discriminatory statements in the form
7   of statements made about her by an employee in charge of hiring for
8   a position for which plaintiff was under consideration.  150 F.3d
9   at 1221 (stating that plaintiff "did not want to deal with another
10  female after having dealt with . . . Louise De PreFontaine").  The
11  court found the comment suggested "the existence of bias and no
12  inference is necessary to find discriminatory animus."  Id.    In
13  addition, plaintiff presented evidence that the president of the
14  company made derogatory comments about women at meetings, the
15  company sponsored hunting and fishing trips to which plaintiff was
16  not invited and other women did not attend, and that a female
17  manager at a sales meeting had been presented with a "Barbie doll
18  kit" with sexually inappropriate contents.  Id.

19          Similarly, in Lindahl, the court found direct evidence of
20  sexual stereotyping of female and male job applicants where a
21  supervisor compared two female job candidates to two male
22  candidates noting the female candidates get "nervous," get "easily
23  upset [and] loses control" while the male candidate had leadership
24  qualities that allowed him to "attack the situation right away, to
25  stay cool throughout the whole process."  930 F.2d at 1439.
26  Because sex stereotyping can be evidence of sex discrimination, the
27  found "evidence of discriminatory motive [ ] sufficient to raise a
28  genuine issue of fact."  Id.

1        In <u>Cordova</u>, plaintiff offered direct evidence of

2   discriminatory animus through derogatory comments made on the basis

3   of race including comments by a manager that a Hispanic employee

4   was a "dumb Mexican" and that he was hired because he was a

5   minority.  124 F.3d at 1149.

6                    **a.   Burkhardt's Statements**

7        Plaintiff asserts that various statements by Burkhardt

8   after plaintiff's March 23, 2006 complaint demonstrate Burkhardt

9   bore "retaliatory animus" toward him that resulted in pretextual

10  discipline and termination.  Opp. at p. 13.  Plaintiff cites a May

11  16, 2006 e-mail from Burkhardt to John Villeneau ("Villeneau"), in

12  which she wrote:  "Curious on your thoughts on the Kam[3] e-mail.  Am

13  I wrong to be personally offended?"  Ex. 87.  Based on the exhibit,

14  it appears Villeneau is a Senior Regional Field Sales Recruiting

15  Manager at JJSR.  An e-mail from Burkhardt to Sharon Maguire

16  ("Maguire"), identified as "Regional Sales Recruiting Manager,"

17  asks the same question.  Ex. 88.  Plaintiff is not the subject

18  matter of either e-mail and the content of plaintiff's earlier e-

19  mails do not appear to have been forwarded or otherwise included in

20  these exchanges between Burkhardt and Villeneau or Burkhardt and

21  Maguire.  Inferentially, the e-mail to which Burkhardt refers is

22  the April 6, 2006 e-mail from plaintiff to Burkhardt.  Ex. 81.  To

23  Maguire, Burkhardt wrote that she is "having trouble not feeling

24  personally insulted by his e-mail.  I felt it was insubordinate,

25  but not according to J&J standards, . . ."  Ex. 88, p. 51.

26  Plaintiff claims Burkhardt's reference to insubordination is

27  _____

28        [3] Plaintiff is known as Kam or Jeffrey.

further evidence of Burkhardt's animus.  Opp. at p. 13.

Plaintiff asserts that Burkhardt constantly criticized him and attempted to censor Skjong-Nilsen from complimenting him. For example, an April 18, 2006 e-mail Burkhardt wrote to Skjong-Nilsen asked, "[w]ere you going to do a VOC or candidate to hire ratio.  I am worried about giving Kam ammunition without showing the whole picture."  Ex. 52.  The April 18, 2006 e-mail from Burkhardt was in response to an e-mail from Skjong-Nilsen that included a copy of the first quarter western region results for recruiters and requests Burkhardt's preliminary approval.  The e-mail with the first quarter results indicates plaintiff filled 55 positions, the most of all area recruiters that quarter, and that he was in the middle of the pack on days to fill positions (48 days).  In response to Burkhardt's April 18, 2006 query, Skjong-Nilsen included a VOC response rate which showed plaintiff's 25% percent return rate and low average rating relative to his peers (3.6.). (Ex. 53, p.31.)  In an April 19, 2006 e-mail exchange between Skjong-Nilsen and Burkhardt, Burkhardt wrote:  "you said in your last e-mail that Kam was holding his own.  I disagree – I believe that you were doing it for him.  Is that accurate?  I just want to make sure that I fully understand what is happening."  Ex. 53.  Burkhardt also noted that she recalled plaintiff "acted completely against what he was asked to do regarding agency candidates in January . . ."  Id.  Skjong-Nilsen communicated to plaintiff that Burkhardt was "very angry" over the accusations made in plaintiff's April e-mail to Burkhardt and that Skjong-Nilsen did not think Burkhardt would get over them.  Skjong-Nilsen Depo. p. 96: 17-23.

**b.   Inferring a Retaliatory Motive**

In contrast to the statements made in Godwin, Lindahl, and Cordova, the evidence plaintiff offers of Burkhardt's statements require an inference of improper motive to be drawn. Burkhardt's statements on their face do not give rise to the inference of improper motive.  Compare Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006)(Title VII suit alleging racial discrimination in promotion wherein decision-maker's use of the term "boy" in addressing African-American employees raised a triable issue of fact as to whether the term was sufficient by itself to show racial animus. The speaker's inflection, tone of voice, custom and usage would have to be considered by the jury.).  No case has been found to suggest that a superior's feelings of offense, without more, rise to the level of direct evidence of retaliatory animus.  Thus, the Court must assess whether Burkhardt's statements evidence a retaliatory motive.

Burkhardt states that she was motivated purely by concerns with plaintiff's poor performance.  Burkhardt's e-mail to Skjong-Nilsen states that she wants to make sure she is "accurate" in her understanding of plaintiff's performance, suggesting away from retaliatory motivations.  However, certain of Burkhardt's statements to Skjong-Nilsen also express anger with plaintiff's April 6, 2006 e-mail and the accusations therein.  Given that Godwin suggests "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial," either Burkhardt's statement to Skjong-Nilsen that she was "very angry" with plaintiff or her statements via e-mail that she was

1  personally offended by plaintiff, create a triable issue regarding
2  retaliation.

3  **C.        McDonnell Douglas Burden Shifting**

4          Even if plaintiff does not show direct evidence of
5  retaliatory motive, the Court may nonetheless conclude that there
6  are triable issues under the McDonnell Douglas burden shifting
7  framework.

8          **1.    Prima Facie Case**

9          As discussed above, plaintiff must first establish a
10 prima facie case of unlawful discrimination.   McDonnell Douglas,
11 411 U.S. at 802-03.  At summary judgment, the degree of proof
12 necessary to establish a prima facie case is "minimal and does not
13 even need to rise to the level of a preponderance of the evidence."
14 Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002) (quotations
15 omitted).  If established, the prima facie case creates a
16 rebuttable presumption that the employer unlawfully discriminated
17 against the plaintiff.   Id.

18              **a.   Protected Activity**

19          Plaintiff alleges he was terminated in retaliation for
20 complaining about Stough and Martin's comments about job
21 applicants.  Given that these comments suggested Stough and Martin
22 were making hiring decisions based on sex and race, these comments
23 were potentially in violation of Title VII and state law making
24 plaintiff's opposition to them protected.  See 42 U.S.C. § 2000e-3
25 (2000).

26              **b.   Adverse Action**

27          "Among those employment decisions that can constitute an
28 adverse employment action are termination, dissemination of a

negative employment reference, issuance of an undeserved negative

performance review and refusal to consider for promotion." Brooks

v. San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Generally, an

action is an adverse employment action if it is reasonably likely

to deter employees from engaging in a protected activity.  Ray v.

Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  Here, plaintiff

was terminated in August.  In addition, he was disciplined in

writing on March 27, 2006 (Deft. MSJ Ex. 110) and placed on

probation on July 1, 2006 (Deft. MSJ, Ex. 124.)  Plaintiff's

discipline and termination obviously satisfy the standard for

adverse employment actions under state and federal law.

### c.   Causal Link Between Protected Activity and Adverse Action

In dispute is the existence of a causal link between

plaintiff's involvement in the protected activity and the adverse

personnel action taken against him.

"Causation sufficient to establish the third element of

the prima facie case may be inferred from circumstantial evidence,

such as the employer's knowledge that the plaintiff engaged in

protected activities and the proximity in time between the

protected action and the allegedly retaliatory employment

decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)

(sufficient evidence existed where adverse actions occurred less

than three months after complaint filed, two weeks after charge

first investigated, and less than two months after investigation

ended); see also Passantino v. Johnson & Johnson Consumer Prods.,

Inc., 212 F.3d 493, 507 (9th Cir. 2000) (noting that causation can

be inferred from timing alone); see also Miller v. Fairchild

Indus., 885 F.2d 498, 505 (9th Cir. 1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings).

"But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (internal citations omitted). Defendant argues that the time between the March 23, 2006 complaint and plaintiff's August termination was too long to support an inference of causation. But, the Court may infer a causal link between the date of the complaint and subsequent adverse actions by the employer that do not involve termination. Yartzoff, 809 F.2d at 1376 ("The supervisors issued the sub-average performance rating in late April 1980, approximately three weeks after Yartzoff, the supervisors, and the EEO counselor met to discuss the complaints on April 4, 1980, and two weeks after the civil rights office investigated the charges in mid-April."); see also Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003) (finding sufficient evidence to support retaliation claim where low performance reviews immediately followed plaintiff's complaints). The Ninth Circuit has noted that while it has "refused to infer causation from timing alone where the gap between plaintiff's protected activity and the adverse employment action extended to 18 months," timing will be found "highly probative" where there is a delay of only a few months.   Stegall, 350 F.3d at 1069 (internal citations omitted).

Here, two business days elapsed between plaintiff's March

23, 2006 complaint and the written discipline he received on March 27, 2006.  Plaintiff's performance reviews and performance ratings and warning letters were also all issued in the months following the March 23, 2006 complaint.  The timing of the adverse action is probative of a causal nexus between plaintiff's protected activity and defendant's adverse actions.

**2.    Legitimate Reason for Discharge Versus Pretextual Reasons**

Plaintiff, having adduced evidence that: (1) he engaged in protected activity; (2) defendant took adverse action against him; and (3) a causal link between plaintiff's protected activity and defendant's adverse action based on the timing between the two may be inferred, the Court concludes that a prima facie case for retaliatory discharge is made out.  McDonnell Douglas, 411 U.S. at 802.  The burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action.  Id. Defendant need not persuade the Court it was actually motivated by its proffered reasons; it need only raise a genuine issue of fact as to whether such actions were retaliatory.  Yartzoff, 809 F.2d at 1376.  If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  At that point, plaintiff must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

"The plaintiff may show pretext either (1) by showing

that unlawful discrimination more likely motivated the employer, or

(2) by showing that the employer's proffered explanation is

unworthy of credence because it is inconsistent or otherwise not

believable." <u>Dominguez-Curry v. Nevada Transp. Dept.</u>, 424 F.3d

1027, 1037 (9th Cir. 2005); <u>see</u> <u>Godwin</u>, 150 F.3d at 1220-22.

Plaintiff may either offer direct or circumstantial

evidence to show retaliation.  Direct evidence is discussed above

and consists of statements or actions by an employer that do not

require the Court to draw any inferences or presumptions regarding

their meaning.  <u>See</u> <u>Godwin</u>, 150 F.3d at 1221.  As discussed above,

the direct evidence in support of finding retaliation is not as

direct as the case law suggests it must be and requires an

inference that Burkhardt's anger manifested itself in retaliation.

Accordingly, where, as here, direct evidence is unavailable and the

plaintiff proffers only circumstantial evidence that the employer's

motives were different from its stated motives, the Court must find

"specific" and "substantial" evidence of pretext for plaintiff to

survive summary judgment.  <u>Id.</u> at 1222.

### 3.   Assessing Defendant's Motivation

Defendant offers arguments falling into three categories

in support of the disciplinary actions taken against plaintiff:

(1) complaints from clients, (2) statistics regarding plaintiff's

poor performance compared to other employees, and (3) statistics

regarding plaintiff's presence in the office.  Defendant asserts

that this evidence offers legitimate reasons for discharge and is

not pretextual.

### a.   Complaints from Clients

The quality of an employee's job performance before

1  termination can lead to the inference that an employer's

2  explanation is merely a pretext for impermissible retaliation.

3  Yartzoff, 809 F.2d at 1376.  Here, plaintiff asserts that prior to

4  March 23, 2006, he had never been formally disciplined.  In

5  response, defendant asserts plaintiff had a history of being a poor

6  performer and the PriCara incident was only the last in a series of

7  incidents.  In support of this argument Skjong-Nilsen's declaration

8  notes plaintiff's prior employment history was less than exemplary.

9  In addition, a 2003 memo by plaintiff's former supervisor shows

10 that some of the same concerns that defendant raised about

11 plaintiff's performance post-March 27, 2006, were also issues in

12 2002 and 2003.  Ex. 104.  The 2003 memo suggests plaintiff did not

13 return phone calls in a timely fashion, received complaints from

14 clients for communication problems, was not accessible outside the

15 office, and generally had a poor attitude when confronted with

16 concerns about his performance.

17        Consistent with this 2003 review was plaintiff's behavior

18 three years later when he failed to give a presentation to PriCara

19 that detailed JJSR's change in their recruiting policies.

20 Defendants claim the PriCara incident was the motivation for the

21 March 27, 2006 e-mail.  In support of this claim, Skjong-Nilsen

22 indicates Burkhardt told her to discuss the matter with plaintiff

23 to find out what happened.  Defendant also offers Exhibit 160 in

24 their reply papers indicating that as of February 2, 2006,

25 Burkhardt intended to direct Skjong-Nilsen to "write up" plaintiff

26 for the PriCara incident.  It is also undisputed that in July 2006,

27 plaintiff was the subject of a complaint by Berghoefer for failure

28 to timely communicate.

The fact that plaintiff had never been formally disciplined prior to the PriCara incident suggests his work was good enough until then.  However, the PriCara incident caused Burkhardt sufficient distress (as demonstrated by the February 2, 2006 and February 2, 2006 e-mails between her and Stough) that she determined plaintiff needed to be formally disciplined (as demonstrated by Ex. 160 on Reply).

However, there is no evidence that a formal request for discipline was ever given to Skjong-Nilsen.  Rather, even accepting the February 2, 2006 e-mail where Burkhardt says she will direct Skjong-Nilsen to write up plaintiff, it is simply a statement of intention, and it remains in dispute whether Burkhardt followed through before the March 23, 2006 incident.  Thus, defendant's failure to timely write-up plaintiff for the PriCara incident raises the issue of pretext.

While plaintiff must "produce evidence in addition to that which was sufficient for his prima facie case in order to rebut [defendant]'s showing, it is improper to ignore the evidence in support of [plaintiff's] prima facie case."  Stegall, 350 F.3d 1069 (internal citations omitted).  Accordingly, it is proper to consider the timing of plaintiff's reprimand and termination as discussed above.  See id.  However, "timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext."  Id. at 1070.  Having offered no evidence of complaints from clients, formal reprimand, or formal discipline prior to the PriCara incident, defendant does little to support its position that the discipline was based on plaintiff's performance before that incident.  Assuming the PriCara incident was a sufficient

trigger to finally cause one of plaintiff's manager's to discipline
him, the fact that the discipline did not occur in February after
the exchange of e-mails between Stough and Burkhardt rather than
late March, after plaintiff's complaint about Stough, raises
questions about pretext.

In support of plaintiff's pretext argument is evidence of
only one complaint after the PriCara incident, but, in terminating
plaintiff, Skjong-Nilsen indicated an increase in negative
feedback.  On March 29, 2006, Burkhardt sent plaintiff an e-mail
outlining her concerns and noting they were not just about the
PriCara presentation but "the greater problem which is your overall
performance to include complaints from multiple organizations,
customers requesting not to work with you, communication issues,
customer management issues and conflict management."  Ex. 113.
Defendant does not offer evidence to support the charge that there
was an "increase" in negative feedback.  Other than the 2003
performance review, defendant provides no evidence of the
complaints referenced in the March 29, 2006 e-mail.

Given defendant's sparse proof of complaints and that
even with plaintiff's poor pre-2006 performance he had never been
formally disciplined, plaintiff has sufficiently raised a triable
issue of fact as to pretext.

### b. Performance Statistics

Defendant claims the performance reviews that followed in
the spring and summer of 2006 were all the result of performance
concerns arising from the PriCara incident.  These performance
reviews found plaintiff performed at the lowest levels among his
peers.

1   While plaintiff notes that two employees who scored just

2   above him were later promoted, defendant notes that the one

3   employee who scored below plaintiff was also fired.  Burkhardt's e-

4   mail to Skjong-Nilsen regarding the performance scores also

5   suggests plaintiff's performance was not the only one under review.

6   Plaintiff complains that the numbers were changed to make

7   him look worse, and, in fact, defendant does not offer the raw data

8   but only the final tabulation of VOCs.  However, the fact that

9   Burkhardt removed VOCs that involved plaintiff's assistant appears

10  to be justified.  As Burkhardt noted in the e-mail instructing

11  Skjong-Nilsen to do so, "Eric," plaintiff's assistant, was the true

12  recipient of the high scores because plaintiff was not in the

13  office at the time those accounts were handled.  In addition, a

14  review of the scores shows that even if they were adjusted down,

15  they were not adjusted from a level that put plaintiff within the

16  top half of his peers, as the July 16, 2006 probation letter

17  required.

18  In light of the fact that the raw data has not been

19  provided and that adjustment of scores has not been shown to have

20  been conducted on other employees or before the March 23, 2006

21  complaint, plaintiff raises a genuine issue of fact as to the

22  validity of the customer satisfaction scores and other matrix upon

23  which he was judged.

24  **c.   Statistics Regarding Plaintiff's Presence**

25  With respect to the Summer Hours Program, the parking

26  evidence is of limited evidentiary value.  It may show the

27  whereabouts of plaintiff's car, but shows less about whether

28  plaintiff was at work during the required hours.  He has offered

plausible explanations regarding his presence and the requirements
of his job outside the office.  On the other hand, the data
regarding his log-on time to the JJSR network may suggest a
reasonable basis for termination.  Ex. 126.

The numbers do not add up to 40 hours a week on the
computer, and they do show multiple Fridays without computer
activity.  However, it is undisputed that plaintiff's job required
him to attend job fairs and he was allowed to work from home.  In
addition, plaintiff's past supervisor's comments are instructive in
understanding why plaintiff might not have been logged on even when
he was required to work from home.  Ex. 104.  That memo indicated
plaintiff was unwilling to use a notebook computer and did not have
a computer at home.  There is no evidence that plaintiff had a
computer at home at which he could log on to the network.
Defendant claims plaintiff had to be logged on to the network to
complete any tasks related to recruiting because they require that
forms be completed.  Defendant does not rule out, however, that
there is work time that does not require one to be logged into the
network, such as time spent reading resumes, making follow-up
calls, driving to job fairs, setting up at fairs, etc.  These
arguments, made by plaintiff, imply that the login data was mere
pretext for unlawful termination.  Thus, there is a genuine issue
of fact as to whether defendant's statistics regarding plaintiff's
performance were a valid, non-pretextual basis for plaintiff's
termination.

**VI.**

**EVIDENTIARY RULINGS**

Plaintiff and defendant both make objections to

1 | declarations and evidence filed in support of each party's

2 | position.  Rulings on these objections are made in orders

3 | separately filed.

4 | **VII.**

5 | **CONCLUSION**

6 |       For the foregoing reasons, the Court denies defendant's

7 | motion for summary judgment.  The Final Pretrial Conference shall

8 | be held April 13, 2009, at 2:00 p.m. and trial is ordered for May

9 | 19, 2009, at 9:00 a.m.

10 |       IT IS SO ORDERED.

11 |       IT IS FURTHER ORDERED that the Clerk shall serve a copy

12 | of this Order on counsel for all parties in this action.

13 |       DATED:   January 7, 2009.

14 |

                           ALICEMARIE H. STOTLER

15 |
                      _____

16 |
                      ALICEMARIE H. STOTLER
                      UNITED STATES DISTRICT JUDGE

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |